Good morning, Your Honors. May it please the Court. My name is Kathy Jones, and I'm here on behalf of the appellant Lynn Noyes. We're here on appeal because the trial judge improperly reduced the jury's punitive damage verdict from 5.9 million to an amount equal to the compensatory damages, which was about 647,000. When Judge Burrell reduced the jury's punitive damages from a 9-to-1 ratio to a 1-to-1 ratio, he erred in several important respects. First, he impermissibly substituted his view of the facts for that of the jury in violation of the Seventh Amendment, and it has been shown in detail in our briefs. Secondly, he failed to consider the State's interest in punishment and deterrence. These important State interests were not even mentioned, discussed, or considered in his post-trial order. As the Supreme Court held in BMW v. Gore, a punitive damage award is only excessive in, and this is a quote, in relation to the State's legitimate interest in punishing unlawful conduct and deterring its repetition. That's 517 U.S. at 568. In this case, a 1-to-1 ratio does absolutely nothing to punish Kelly or deter any future conduct. $647,000 is less than the court ordered my fees in this matter, and there's no knowing how much Kelly has charged their client or been billed. Well, but we have a lot of Supreme Court cases on this subject that we don't have to discuss at length, but I don't think that they ever suggested that we compare punitive damages to the fees. I understand, but the amount is so microscopic compared to Kelly's net assets. Half a million dollars is microscopic, maybe to you. It's not a microscopic amount in general. If the jury had said $647,000 was the amount of punitive damages, we would have accepted that. The jury could have said zero was the proper amount of damages. But in this case, the jury said 5.9 million. Based on the reprehensibility, the Gore guideposts and the facts and circumstances of this case. Yeah, but the Supreme Court has put limits on this. The single-digit ratio, that's true. We're within those limits, Your Honor. And I believe also under the reprehensibility analysis with those subfactors, even Judge Burrell found that we met four out of five of those subfactors for reprehensibility. We're asking you to apply the constitutional standards to this case and to restore the jury's punitive damage verdict based on the facts of this particular case, as, you know, the Supreme Court has held it is required. Well, there are a lot of very subjective factors in what the Supreme Court says. You know, reprehensibility gets you over the initial problem. But how reprehensible is a particular act? I mean, these are very fact-intensive decisions. That's true. And also, how much of a deterrence is it to make sure a company won't do this kind of thing again? And how much does it take to punish a particular company? These are important questions. These are all questions of individual judgment. That's right. And the jury exercised its judgment in this matter and gave us a certain amount. They gave us less than what we asked for. I don't believe this is a runaway verdict for a number of reasons. I think this case can be used as a deterrent example because it shows employers exactly how they're not supposed to act. You don't ignore the letter that was written in 1999 by an anonymous worker at my client's work site, which is at ER 39, and states this was two years prior to the disputed promotion. The letter states that, quote, a large number of the employees in this department feel discriminated against and are afraid to confront the local management. It talks about unfair practices with respect to hiring, promotions and salaries. It says that many of us are afraid to confront the issue because we are outnumbered here. And so this letter required a response from Kelly. Did they appropriately respond? In our view, no. What they did was send out the to investigate, they sent out the very same people who had approved the discriminating manager's illegal employment decisions. And then several years later, when the number two person in the Nevada City work site complained about the illegal discrimination, going so far as to visit Teresa Dolbert at her office in Michigan, complaining about the illegal hiring of Mario Fantoni, his complaints were ignored. And when he left the Kelly services just prior to the promotion, he complained about the illegal discrimination again. You don't ignore those types of matters. You don't ignore it when other employees come and say, you know, I feel I'm quitting, I'm leaving this job because I feel like I'll never be promoted here because I'm not a member of the Fellowship of Friends. All of this happened before 2001. And then in 2001, when my client complained, she went, tried to complain, I mean, she complained internally. She didn't just file a lawsuit. She went to her manager, William Hines. How did he respond? He banished her to a dead-end job, taking away her managerial opportunities. So these are good jury arguments. These are the facts of this case. I know that. I know that. But what do you do with language like the language of the Supreme Court in State Farm that where compensatory damages are substantial than a lesser ratio, perhaps only equal to compensatory damages can reach the outermost limit of the due process guarantee? Well, it's a fluid argument. Of course, there's no mathematical certainty. But in this case, I believe the facts were interpreted. The jury wasn't inflamed by passion or prejudice. They considered Kelly's net worth. They considered the harm. I think they considered the 1999 letters and all the things that happened before 2001. And they came to a reasoned determination. Judge Burrell apparently disagreed with that. And on a constitutional ground, he took it away. I think it was in violation of the Seventh Amendment, because the jury verdict itself was constitutional under the guideposts. It is a single-digit ratio. It is a repre ---- I believe it's a highly represent ---- reprehensible conduct that Kelly engaged in in this case. And the other facts, you know, it's all discussed in our brief. But I agree. It is, you know, there's no certain number that you can put on to a particular case. As the Supreme Court has said, the precise award in any case must be based on the facts and circumstances of the defendant's conduct and the harm to the plaintiff. My client lost her management career. You know, she really worked hard commuting seven years to Sacramento to get her MBA. She came on board saying she wanted to be a manager. And, you know, this wasn't the first time this had happened to her. Judge Burrell recognized that it had happened three or two other occasions. As I pointed out in my brief, it was actually three times. Did you try the case? Excuse me? Did you try the case? Yes, I did. They had a chance to fix this in 1999. They had a chance to fix this in subsequent years. They had a chance to fix it when it happened. They swept my client's complaints under the rug. And they didn't handle it properly. And I think they should be punished. As for Kelly's cross appeal, I guess I'll speak of that briefly. They reject the jury's 5.9 million. They also reject the judge's one-to-one ratio. In fact, they say we are entitled to absolutely zero punitive damages because we haven't shown malice. At Page, they even go so far as to say that we did not even attempt to prove malice. I mean, of course we did. You can look at the jury instructions of the special verdicts in the record, and I can give you the cites. Judge Burrell's order held that there was substantial evidence to support a finding that Heinz acted with malice and that his actions were approved by Ramsey. Ramsey was the senior vice president of human resources in Michigan. Kelly argues that this is just a case of favoritism, referring to the man who got the promotion, Yielson, as Heinz's neighbor and friend. This is not favoritism, Your Honors. This was a religious cult that had been allowed to take control of this workplace in the sense of getting the higher promotions and salaries and better positions. Unlike the cases cited by Kelly, religion is a protected characteristic.  of desire to have members of a small group in a small community? Well, there is a difference, but if you look at the race analogy, if I'm white and I'm an employer and I promote and favor whites, not because I don't like blacks or I don't like or dislike brown people. No, I said a small group that's discriminated against itself, a small group that is assisting other members of a group to reach management positions. As opposed to an animosity against the group you're keeping out. Well, there is somewhat of an animosity, as the expert testified at trial and is in the record here that they didn't look on outsiders very favorably. Outsiders being 98% of the people. Yes, they're very insular. Yes, it's an unusual circumstance. I agree, but I believe it is. Is that the same type of malice that you have when you keep blacks out or Jews out? I think it can be equated to that. I know it's a reverse situation, but there was malice toward the non-fellowship members in the sense that, you know, we don't care about your civil rights. We don't care. You deserve this promotion, but we're not going to give it to you. We think you should be paid more, but we're not going to pay you because we favor our people. It's not fair. It's not in the laws prohibit that type of discrimination. Even in this case, in the prior, this Court's prior decision when we were up on appeal last time on summary judgment, the Court held that this type of favoritism could be and was evidence of a legal discrimination so as to overcome, you know, a factual, a disputed factual issue on summary judgment. It's not just mere favoritism. I mean, even nepotism can be held to be illegal if it perpetuates a discriminatory status quo, and that's more like what was said. And you would give the same kind of punitive damages for nepotism than you would for a malice or a hatred of a group? Well, I think this behavior in this case was much more reprehensible because, in fact, they are against outsiders. I just ---- We've given you a lot of time, and perhaps we should let the cross-appellant present argument before you address further the argument. Okay. I just had one point, Your Honor, if I may. We do object for a request to Kelly's request that this matter be sent back to the trial court for entry of a remitter order. The only appeal ground is here is the constitutional ground, which, of course, you're able to decide. And if it is remitted, we ask that you do so in the interest of judicial economy and the interest of justice would be solved by having this resolved at this level. Okay. Okay. Thank you. Thank you, Your Honor. Mr. Cain. Paul Cain for Kelly Services. May it please the Court. Counsel identified a number of factors that the jury in this case supposedly considered, but one thing the jury did not consider was the centerpiece of Kelly's defense to punitive damages. Plaintiff argued for punitive damages because, she said, Kelly took no action in response to religion discrimination. But the trial court excluded from evidence Kelly's defense. The DFEH has written determination following its investigation that there had been no religion discrimination to remedy. We suggest this case is just like the Seventh Circuit's en banc decision in EEOC v. Indiana Bell. The court there said that the court had erroneously, trial court, had erroneously held irrelevant a document that would have helped explain what the company did and did not do. And what the Seventh Circuit said --" How would these letters have done that? I'm sorry? How would these letters have done that? Because the --" Aren't these the determination on the ultimate merit in invading the province of the court? Kelly sought to introduce two forms of evidence. One is the determinations themselves, and in the alternative, it sought to introduce just testimony that the DFEH, after investigation, found no discrimination. It's --" So if an employment discrimination potential plaintiff goes to the EEOC and they say, you have you don't have a case, that means you can't go to court? No. Of course you can go to court. And would that letter be admissible in a discrimination suit? Now, this Court already has held in the Beachy case that it is proper to exclude that determination if offered for purposes of liability. But what Kelly was attempting to do here is to answer the question, why didn't you fire William Hines when he was such a bad discriminator? Kelly wanted to respond, we didn't fire Hines, because after the DFEH investigated this, the DFEH concluded there had been no discrimination and that there was, therefore, nothing left to remedy. So our position, as the Seventh Circuit said in Indiana Bell, is that the employer is entitled to show that things aren't as bad as they appeared. And from the standpoint of what the company thought at the time, it believed that no further action was required on its part. Now, the district court, as I understand it, said the admission of the actual letters would be very prejudicial to the plaintiff. But permitted you to show the timing of the agency determination, how did that work? What the trial court permitted Kelly to do was to introduce evidence that it deferred its investigation pending the EEOC's determination. But then it said, stop, you can't tell the jury what the DFEH actually found. Right. And what you wanted to show was that you were waiting for the investigation, the existence of the investigation was the reason that you didn't fire the guy. And so I'm not seeing, it seems to me that you were able to show that. It wasn't just the existence of the investigation is why we didn't fire the guy. It was, our position would have been that we didn't fire the guy because at the end of that investigation, the EEOC said there was nothing that required a remedy. And so what the trial court did is impede Kelly from making its defense, precluding it from demonstrating that its inaction, as the plaintiff would describe it, was triggered in part by what the DFEH itself had found. Let me ask you a little bit about this from the record about the fellowship. The record says it's a group that focuses, I'm quoting here, an esoteric interpretation of religion associated with the teachings of the Old and New Testaments, traceable also in Greek philosophy and probably originating in Egypt and Asia. Could an observant Jew belong to this group? I just don't know, Your Honor. We're not contending that this group. Could an evangelical Christian? I don't think this is clear from the record. Could a Buddhist? I don't know. An adherent of Islam? I'm sorry. I don't know. And the group has about 2,000 members? I believe that's what the record shows. But they apparently dominate the decision-making at this particular organization. We have assumed for purposes of this appeal that there was sufficient evidence to find that the adverse promotion decision with respect to the plaintiff was based on the decision-maker's favoritism of another member of this organization. And so we have not appealed the liability determination other than to say that because the punitive damages were so tainted by the exclusion of the evidence necessary to the theory of defense. And you don't think that's reprehensible? I think on the spectrum of reprehensibility, it is a low case of reprehensibility as the trial court found. The theory here was not animus against the plaintiff. The plaintiff's theory was that the decision-maker sought to lend a helping hand to another member of this fellowship. Now, did this conduct exist in any place other than this, whatever this place, Oregon City? Was that it? Apparently, this group has its headquarters in Oregon City, and the one Kelly office at issue here was in Nevada City, which is about an hour away. Is there any showing in this case that this occurred anywhere other than in Nevada City? No. This is a nationwide organization? The employer? The employer is a nationwide organization, yes. It's a very large temporary personnel services organization. Did Kelly take any action against these supervisors? That's precisely our theory of the case. Well, eventually the office closed down, and by stipulation that was for non-discriminatory reasons, and the supervisor decision-maker was laid off at that time. Kelly's entire theory of the case as to punitive damages was that it took no action because the DEH's determination had been that there was no adverse action that needed to be taken. And by the time the jury verdict came out, the office was closed. Is that correct? Yes. I don't think I completely answered Judge Schroeder's question about the Rule 403 factors. It is true that the trial court grounded its decision in part on Rule 403, but that readily could have been cured. Under Federal Rule of Evidence 105, the trial court is supposed to consider giving an instruction as to what the weight of evidence is, and that Rule 403 only kicks in if there's prejudice left over after that instruction is given. On a scale of 1 to 10, if she had been denied a promotion because of her gender, how reprehensible would it be? Would that be a 7, 8, 9? How would you place it on the scale? I don't know that you can. I think Congress has said that gender discrimination is just as bad as race discrimination, and I don't think I would differentiate one over the other. But what we have here ---- So in your mind, gender discrimination would be just as bad as racial discrimination? In my mind, yes, there are some cases of this Court that have emphasized that race discrimination is, if anything, first among equals. I'm just trying to get your gauge of the reprehensibility scale, if you will. What would be a 10 on a scale of 10 of reprehensibility? Well, certainly race discrimination would fall into that category as this Court's case is held. And what would be a 1? I think this case falls at the low end because, again, here the entire theory of the case was not animosity or hostility, but rather favoritism. It was lending a helping hand to another member of the group, to assist another member of the small group. The plaintiff, we're assuming, was, for purposes of this appeal, was a victim, in a sense, of that favoritism, but it was not the same kind of animus that a race discrimination case would be in which a bigoted employer says, I'm not going to hire you because you're black. That's kind of at the core of what Congress sought to prescribe, animus. We're not going to promote you because you're black. That's pretty reprehensible? Yes. But if we've got this tight-knit group that excludes lots of different people and we're promoting people who belong to it but not people who don't, that's not reprehensible, or it's less reprehensible? I think it's less reprehensible because it's lending a helping hand to another member of the group. I'm not defending discrimination of any sort. This Court's prior decision is the law of the case. It says that there's a cause of action for this. No, I didn't assume you were. I'm just trying to get a feel for your client's view. I think this is a very unusual case in which we have a almost like a third-party victim here, where the wrong was lending a helping hand to another member of the small group. And I think that, I'm not defending it, but if that occurred, I think it's on the lower end of the list. Well, I guess if we've got a scale of 1 to 10, there have to be some types of discrimination that are not as bad as others. So that's why I say this is rather a subjective question, because I don't think we've yet said what's less than a 10. A couple of the Court's cases have said, without quantifying it, that race is a 10. Yeah, race is a 10. But have we said what's a 5 or a 1? No, I don't think so. But I think this is a case in which it really is a very unusual one in which, again, the decision-maker may have acted wrongfully, but in an effort to assist another member of the sect rather than to directly harm the plaintiff. The plaintiff seeks to justify the exclusion of the DFEH determination on the ground that, well, perhaps the jury could have found ratification preceded the DFEH's determination. And that's an argument that, in our view, should be made on retrial. Well, we don't know what theory of ratification the jury relied upon. The jury made no factual findings on this point. What we do know about the jury's thought processes is that the jury thought the DFEH determination was important, and we know that because the first question the jury asked when deliberations started is, what did the DFEH find? And the court said, never mind, you don't need to resolve that. I think that illustrates that the exclusion very likely was prejudicial and that, at least for purposes of punitive damages, the jury would have awarded no punitives or a lesser amount of punitives had the jury known what the DFEH had found. Indiana Bell was a 402 case? Yes. And we're dealing here with a 403 issue? Correct. And the standard of review is what? Abuse of discretion? It's abuse of discretion, and I suggest that standard is met here because, one, as I mentioned, the jury instruction would have cured the problem. You simply could have said, jury, this is admitted not to show whether discrimination occurred. This is solely admitted to show the effect on Kelly upon hearing what the DFEH had The distinction is that you want to admit it to show that Kelly didn't do anything because the agency said it didn't do anything wrong. Yes. But you don't want the jury to think that the – that Kelly didn't do anything wrong from the evidence. That seems like a very fine line. No. Trial counsel made it very, very clear on the record that he said, Judge, you can tell the jury that it's up to you to decide whether or not discrimination occurred, but tell the jury this is offered solely to show the effect on Kelly with respect to its actions after it received the DFEH's determination. You don't have to feel compelled to use all your time. We've given you as much time as we give the Exxon Valdez. Thank you. I do have another response to Judge Hawkins, however. The standard of review is abuse of discretion, but an abuse of discretion exists where an error of law is committed. And because the trial court did not engage in the Rule 105 analysis of considering what the instruction – considering the effect that an instruction would have had, that's an error of law. A separate error of law was relying on this Court's prior decision in the Beachy case, which simply considered an inapposite question of admitting the determination based on – based on it being proffered for reliability rather than punitive damages. I would like to address damages in the alternative, including punitive damages. The jury awarded more than $147,000 in economic damages. The proper amount was a little bit more than $36,000. And that's because the recovery had to be cut off as a matter of law on the date that, according to the party's stipulation, the Nevada City office closed. That was wholly nondiscriminatory, and the damages up to that point in time, economic damages, were $36,000. The plaintiff in her brief contends that she was entitled to recover for lost earning capacity, and that is a valid theory of recovery if it's properly before the court. But that was not pleaded in the complaint. That was not pleaded in the pretrial order. And there's no evidence of it in this case. The plaintiff, in effect, proved that she was unemployed and underemployed after leaving Kelley. But as a matter of law, that's not Kelley's responsibility, as numerous courts, including this Court, have held. I think the same problem taints the emotional distress award, because plaintiff painted a very sad picture about her work situation afterward. But, again, that's not Kelley's responsibility. The $500,000 award here just has to be traceable to her post-Kelley dissatisfactions, not to anything that happened at Kelley. What she said, and we're assuming to be true, everything she testified, is that she felt demoralized, she felt anxious and jittery, she said losing the promotion took the fun out of work, and she testified that two or three times over the years – she didn't say what years – she took Xanax two or three times. And mostly she made herself feel better through exercise, hobbies, and putting down good thoughts on paper. There was no counseling, there were no physical symptoms, there was nothing of the showing of emotional injury that is associated with the affirmance of very high emotional distress awards. And I think it's significant. Even Ms. Noyes' counsel at trial didn't attempt to argue for emotional distress based on actual evidence. She just told the jury, well, multiply the economic damages by three or four or five and give us that for emotional injury. We think the award has to be grounded in evidence and that there isn't any. I think Ms. Noyes' appeal should be moot in light of what I've argued, but let me further address the punitives in the interest of completeness. Senate amendment doesn't apply. The jury made no finding that we're asking this court to reverse. And under the Supreme Court's teaching, it's up to courts to review punitive awards de novo. I don't think it's a case of high reprehensibility. As I've said, there's no bodily injury, no physical harm. It was a promotion case, not even a discharge case. And again, it was a case of favoritism, not one based on animus. Further reason why the punitives at a one-to-one ratio at most is the most that can be justified is that, again, we have the high compensatory award. And as the cases have recognized where the compensatory damages are high, they very likely include a punitive element already. And the final benchmark the Supreme Court has pointed to is, well, what civil penalties could be imposed for this? And the awards here are double the Title VII cap and four times the maximum civil penalty under the FEHA. One last point. Let me assume further in the alternative that the court were to disagree and that a larger punitive award than that imposed by the trial court could be justified here. Under the Johanson case, which counsel herself has relied on in her brief, the proper course, if the court were to disagree with everything else I've said, is to remand the case for the trial court to consider a remittitor. Here the trial court simply reduced the punitives as a matter of law. And if the court were to disagree, and I hope and request that the court not disagree, but if it did, the trial court should be given another opportunity to consider a remittitor order. Again, however, we think the proper result is a total new trial with the critical DFEH determination admitted either in documentary form or at least through a witness saying that we didn't act because the DFEH told us that there was no discrimination to remedy. Thank you. Thank you. Thank you. On the DFEH letters, I just want to make it clear that I think Kelly has a very good point. Those letters were not written until the summer of 2002. The failure to promote was in 2001. We're only talking about conduct supporting the punitive damages up to and including 2001. So not only that, the letters are hearsay, because if they're trying to admit them for the truth of the letters, that is, our conduct wasn't as bad as it looks because this agency found that it wasn't so bad, fails, because they're relying on the truth of the matters in the letter. They try to say that they're avoiding the hearsay problem by saying they're trying to show that it's to show the effect on Kelly after receiving the evidence. But in 2002, they would then, of course, have been relying on the truth of the matters asserted therein. But more importantly, the letters have simply no relevance to conduct prior to 2002, since they weren't written yet in 2001 and before. And Kelly's arguing that we put forward two theories of liability to the jury in support of the punitive damages. That is both before and after the letters were written. And their only cite for that is at SER page 70, where they say that we referred to arguments about, quote, the continued denial of discrimination in Nevada City. I urge this Court to take a look at SER 70, because the full quote is quite different. It's a long sentence, but the relevant part was, We have shown that Kelly's continued denial of discrimination in Nevada City resulted in direct harm to my client when, in 2001, she was denied the promotion. We never argued for any wrongdoing on the part of Kelly after 2001. In fact, the record's devoid of any references to any conduct of Kelly after 2001 that would have authorized the increased punitive damages. On the DFEH matter, I think I would just put the hands-off policy during the EEOC, the Seventh Circuit EEOC v. Indiana Bell case, talks about there was a union collective bargaining agreement at the time, and that's why the employer's hands were tied. They couldn't do anything. And we never said, the client should have been fired. It was just, let's put this to rights. Let's give my client a promotion to management. Let's try to prevent these unfair paying and promotions of the fellowship people. They're free to conduct that as they want. But I guess the point that I've started to make was that during the pendency of the DFEH investigation, Kelly had a hands-off policy. All that evidence was before the jury. They were free to explain by stipulation that they didn't do that. They didn't take any action then because of the investigation. With respect to the compensatory damages, these damages were not challenged at the district court level and are therefore not properly before this Court. None of the exceptions apply here, such as miscarriage of justice or a pure issue of law. They argue that the economic damages are excessive as a matter of law, but they ‑‑ this is not strictly a legal argument because they don't have the evidence. It wasn't developed below. What they're trying to do is compare apples to oranges in the time period of the damages. Youpielsen held the promotion for four years. And my expert calculated damages differently. He used the entire seven-year period prior to trial for my client's earnings. What Kelly has done is subtracted those seven years of earnings from Youpielsen's four years of earnings to come up with a 32,000‑something amount. I'd like to point out at any rate that my math is correct in this matter. Well, let me understand your response to the argument that because Kelly shut down, the office shut down. That's correct, Your Honor. She shouldn't be able to recover damages beyond that point when she would have lost her job anyway. Right. And your response to that is? The real issue is that it's lost earning capacity. It's earning capacity, and she lost her ‑‑ Left ‑‑ When they closed down, she wasn't a management employee, and she couldn't get reemployment as a management employee. Yes. She was left with a defective resume. After 10 years with Kelly, she didn't have a management job. And as a 54‑year‑old female, it was difficult to land a management job. That wasn't a very large thrust of our argument, but it did relate to the damage arguments in terms of future wage loss. Okay. And that is a legitimate item of damages. They never had an economic expert. They didn't cross examiners, and so they had no evidence to the contrary. In emotional ‑‑ same with emotional distress. Kelly never challenged the emotional distress verdict below, and it's not a pure issue of law. They're not taking everything that we say as a matter of law. They're selectively quoting from it, minimizing it, putting their spin on it. They're simply asking this Court to find whether there was legally sufficient evidence for a reasonable jury to determine a certain amount of emotional distress damages. They didn't do that below, and therefore they waived that opportunity to do here. As is shown in our briefs, I think that noise was properly compensated for emotional distress damages. I think you've done a pretty good job of covering the issues. I think employers have a strong interest in preventing discrimination. In light of Kelly's failure to do so in the years preceding the promotion at issue, despite all the red flag warnings, the punitive damage verdict should come as no surprise. Thank you, Your Honors. Thank you. The case just argued is submitted for decision.
judges: Schroeder, Reinhardt, Hawkins